The driving factor in determining the sentence in this case back in 2002 was the calculation of loss under the sentencing guidelines. In preparation for the sentencing hearing, we requested an evidentiary hearing. We hired a CPA who prepared an analysis of the value of the funds in two bank accounts. We obtained a declaration from the Utah County Assessor. We hired an MAI appraiser to appraise the value of two San Diego farm parcels. When we got to the sentencing hearing and began to go through the values of each of the assets that arguably were the subject of the conviction of concealing assets in bankruptcy, the court said, I don't have to get into those values because the measure of loss that I'm applying here is not actual loss, it's intended loss. And if it's intended loss, I don't have to get into actual values. The court prejudicially erred in two respects there. First of all, intended loss was the wrong measure of loss. It should have been actual loss. And secondly, whether you're looking at intended loss or at actual loss, the case law is clear that you have to value the assets that the defendant's been convicted of concealing. Let me ask you this. I understand that argument, but what Ninth Circuit authority supports your argument that the intended loss should be limited to the value of assets concealed or the value of the debtor's liabilities, whichever's less? Well, first of all, in the prior opinion in this case, of course, the court cited to the Feldman decision. And while Feldman is from a different circuit, you know, the prior panel relied on Feldman. And the analysis in Feldman is precisely the analysis that we're talking about. The other cases, and I don't have them all. Suggesting law of the case? It's certainly law of the case on the issue of restitution, on the issue of sentencing, as the court knows. Pursuant to Ammaline, the prior panel did not reach any of the issues on sentencing. The other cases that we've cited in the brief, I believe Stoddard and others say that, again, in determining loss, the court has to make a calculation of what the injury is, what the loss is that was suffered by the victims. And neither in the district court, nor on the prior appeal, nor in the briefs the second time around, has there been any disagreement between the parties as to whether the Dolan standard from the Eighth Circuit is appropriate? The government has said that we fit within Dolan, that the government fits within Dolan, and we disagree. So I don't believe that there is any disagreement about that standard, but I recognize that Dolan and Chevy and Wheeldon are all cases from the Eighth Circuit, not from the Ninth Circuit. Returning to the issue of why the court was wrong both in using intended loss as the measure and secondly in not calculating the value of individual assets, intended loss would be the proper measure in the following scenario. Assume that the debtor owes $500,000 and schedules $500,000 on the bankruptcy petition, but doesn't disclose that she put $100,000 in a coffee can and buried it in her backyard. If the $100,000 is discovered before the bankruptcy proceedings are complete and the creditors in the court learn of those funds and factor them into whether to dismiss the case or to apply them to the debts, then there would be no loss. There would be no actual loss, and so you would look at intended loss. And so, for example, in Wheeldon there were assets that were not scheduled in the original bankruptcy petition, but they came to the attention of the bankruptcy court later, and so the court used intended loss as the measure rather than actual loss. But what if the assets that are hidden would make the difference in terms of whether the debtor owes $100,000? Well, I'm not sure. You didn't give us enough numbers on your $500,000 and $100,000 in the can, but in this case, as I understand it, if we take the $2.3 million and add that to the disclosed assets, presumptively the individual is not eligible for bankruptcy. Am I wrong? Okay. I'm not sure what Your Honor is referring to when you say the $2.3 million. Isn't that the restitution order? Yes, but the restitution order was based not on a calculation of assets. The restitution order was based on the amount of the debts that were scheduled. There has never been a valuation by the district court of the assets that were concealed. Well, there was a mention of it. There were numbers in the PSR, correct, of concealed assets, and I think at some point in the discussions, I think that there could be an argument made that the, I think, were you the lower court? Yes. And you were saying, well, do you want me to go through the numbers or something, and the judge said, well, they're in the PSR or something along those lines. No, the court did not say they were in the PSR. The court said quite clearly, and we've quoted it probably six different times in our brief, that if I use intended loss, I don't have to get into the values. And again, we requested an evidentiary hearing. The court in response to the request said, well, we'll determine later whether it's necessary, and the court never got into valuing the assets, and there is no way whatsoever that the court could ever reach a number anywhere near $2.4 million. The numbers in the PSR, you know, as it sets forth in the PSR, that the numbers are taken from a trial memorandum provided to the probation officer by the government, and we challenged those, and the court never addressed those challenges. What's the discrepancy between what the PSR total was and what your challenge was? Well, let me walk through the potential assets. First of all, count one, the conspiracy to conceal assets is very specific in identifying assets. You know, in some bankruptcy concealment cases, you will see that the prosecution asked the grand jury to charge, and the grand jury charges that the defendant concealed assets, including but not limited to the following, or the following among others. That's not what the indictment here says. It says that the defendant concealed three specific assets, interests in two medical management corporations, and equity in a condominium in Utah. Those are the only three assets. With regard to those three assets, talking first about the medical management corporations, undisputed that they had $955,000 in bank accounts. And it's also undisputed that the $949,000 at least that was in the BBL bank account was subject to unpaid taxes because that was the subject of counts 14, 15, and 16 of the indictment, not against my client, but against her husband. And it's undisputed that if those funds would have been made available in the bankruptcy court, not only would the taxes first have had to be subtracted, but also any distribution to the bankruptcy estate would have also been subject to taxes. That's undisputed based on the testimony of the courts of the government's bankruptcy expert, Mr. Albert. And it's also undisputed because in count 17 of the indictment, they're discussing what happens after distribution of the funds from the bank accounts and saying the taxes were owed. And we performed a calculation, it's in the record below, and it's never been disputed by the government that after application of all the taxes and penalties and interests that apply to the $955,000, you end up with $85,000. Now, I fall off the track here, okay? Okay, I apologize. Because we have to be sure we're talking about loss for the purpose of sentencing and loss or amount of restitution. They're two separate, distinct issues. Absolutely. And we have to keep focused on the two of them separately. Right. And it's helpful if when we're talking about this, we talk about either restitution or sentencing. Right, that's what I'm talking about right now. All right. This defendant was convicted of a conspiracy. Right. To engage in immigration fraud. Not immigration. Bankruptcy fraud. He was convicted of concealing three assets, making false statements in a bankruptcy, and I forget what that false oath is in bankruptcy. Okay. Now, well, but the conspiracy was to conceal assets? To conceal three specifically enumerated assets. And that was the measure of the conspiracy? And what you're talking about is not just overt acts. You're talking about the conspiracy itself was simply to conceal assets. There are three different objects of the conspiracy. All right. Looking at the indictment and reading from, let me get the right paragraph. I'm sorry. Go ahead. If you look at page 8, I think it's ER page 8, and page 8 of the indictment, paragraph 24, objects of the conspiracy, number 1, to knowingly and fraudulently conceal or transfer property in contemplation of filing for bankruptcy. All right. Number 2. Wait a minute. Now, stop right there. That's open-ended. Is it not? Well, until you get further on to the indictment. Okay. But it starts out as open-ended. Right so far?  Okay. It's saying that. Go ahead. That they're planning to conceal. Okay. Go ahead. B, paragraph 24B on page 8, to make false statements. Yes. And C, to knowingly and fraudulently conceal assets. And then when you get into the means of the conspiracy, they talk specifically about the properties that were concealed. But the means do not have to be as expansive as the conspiracy. What I'm getting at is if you literally look at what she was convicted of, this conspiracy, it's open-ended. To conceal assets. And then we're not, or are we, bound then to just look at these things that have been enumerated so far? Or do you look at the purpose of this conspiracy and then see that she has a couple million dollars or more in debts, that she succeeded in getting discharged? And if you look at the intent and the purpose and the scope of this conspiracy, it wasn't to get part of the debts discharged. It was to get them all discharged. Right? Okay. Now, okay. You go ahead. There are two different intent analyses there. One is was there intent to commit the crime? And the jury found the specific intent to commit the crime. But when you're looking at intent or whether you're looking at actual with respect to loss, the cases are uniform that you have to value the assets. And so you have to identify specific assets. And as the panel knows, we have focused on the three specific assets. But even if we counted the additional, quote, assets that the government has presented in its briefs in the trial quarter here, you still end up with a number that is under a million dollars. Well, I'll get back to that. But when we're talking about the scope of the crime and what number to apply in the guidelines or the calculation of whatever it's to be to be a reasonable sentence, once she's convicted of a conspiracy to conceal assets, this thing kind of gets broad in its scope as to what the court ought to consider that the mischief to be achieved by that conspiracy really was. Okay. Respectfully, I disagree for at least a couple of reasons. Number one, what the indictment talks about is conspiracy to conceal three specific assets. And secondly, if you look at what the government represented to the court at the time that co-conspirator Jeffrey Sherman was sentenced, Mr. Sherman is the former IRS lawyer who handled the taxes. He's the one who filed all the documents in the tax court proceeding. He's the one who prepared the bankruptcy petition, which is the subject of all of the offenses that my client was convicted of. And he's the one who exchanged correspondence with Mr. Beaudry, who he brought into this case saying, we've got another one. You know, he's right in the middle of everything. And the government said to the court the loss attributable to the conspiracy in this case, to count one and to count 12, which is the tax evasion charge, is $353,000. Frankly, I think $353,000 is too much. That's the upper limit. The government can't come in and say to the district court judge, this conspiracy involved a loss of $353,000 on one day, and then on another day say forget everything we said before, it's a different number. There's two other things I want to call to your attention now. You notice in the government's brief they keep referring to the pre-sentence report. I'm quite aware of that. And I assume or presume, without having checked this now thoroughly, and you correct me if I'm wrong, but at some point along the line the district court either initially or on remand adopted the pre-sentence report. Initially, in ruling on the objections, the court overruled our objections. And so she did adopt the pre-sentence report? Initially. Did she ever unravel that adoption? Well, that's what's set forth in the minute order that preceded the hearing. It's not a minute order. The court's tentative, excuse me. The court does that, and then I walk through, as the panel can see from reviewing the transcript, I walked through all of the assets, and we had requested an evidentiary hearing, and the court says we don't have to get into any of that because I'm using intended loss. Now, the other thing that I want you to comment on, and I appreciate you taking some of your time, somebody's talking about a million dollars that came from someplace that wound up in a Swiss bank account. Where did that come from and where did it ever go after it got to Switzerland? Okay. The government is talking about that in its brief. Right. And there was substantial testimony on that subject in the trial, and that relates to Count 17, which involves a distribution. The funds were withdrawn from the San Juan Bank account in 1996, and then John Bucel and Mr. Beaudry are involved, according to the evidence, in moving the funds around. My client was acquitted of that charge, number one. And number two, those are events in 1996 and subsequent, and what we're talking about is a conspiracy that ended according to the indictment in 1995. So it has nothing to do whatsoever with the sentencing in this case or any issue on appeal. Was there a verdict on that? Yes. My client was acquitted. He was acquitted on 17? Yes. And again, 17 involves a time period subsequent to completion of the conspiracy, which is the crime of which my client was convicted. It is not an overt act. It's not anything as part of the conspiracy. Now, let me ask you. If the conspiracy of which he was convicted, as described in this indictment, is broad enough to include the million dollars that they may have jockeyed around after the conspiracy, according to the terms of the indictment, had closed, does that shut the court down from considering it? The million dollars is essentially the $955,000. So it's the same amount of money. But you still have to look at, in calculating the actual loss, and this really is an actual loss case because nobody discovered the funds during the bankruptcy, you have to look at where the creditors would have been if this had all been disclosed. And because of the tax liabilities that… It only goes to the amount. But I take it that your position is that whatever happened to that money, wherever it came from and whatever became of it, it's off the chart as far as the court considering it, either for the purpose of sentencing or for the purpose of restitution. Am I right? Certainly, because what happened in 1996 or 1997 is not the offense of which my client was convicted. Would you like to reserve your minute and a half? You may do so. I think I'll take your time. I'll reserve it and then I'll comment about a restitution when I return. Thank you. Very fine. We'll hear from the government. Thank you. Good morning. Paul Stern, Attorney for the United States. Also present is co-counsel Ronnie Katzenstein, who will address any issues relating to costs or the reconveyance of the trust deeds, should the court wish to inquire on that matter. I'd like to start with the question about the million dollars and whether that could fairly be considered and what happened to it in connection with determining this defendant's relevant conduct. The evidence at trial showed the million dollars were essentially concealed profits from defendant's dermatology practice, where she agreed to set up a so-called medical management company, the officer and nominal owner of which was defendant's bookkeeper. Every year between 1993 and 1995, $300,000 to $400,000 was socked away into that account. That was the BBL account of which the defendant was convicted of concealing. You'll notice that the conspiracy alleged in count one continues to February 1996. The plan that was authored by Mr. Beaudry in consultation with defendant and her husband provided that the medical management company, among other assets, would be set up so that no creditors would understand that those were defendant's assets. And so they would be in a position to appear upon the filing of the bankruptcy as if they did not have a million dollars in a non-interest bearing bank account, of which the signatories were two friends of the defendant's who also testified at trial. They had no knowledge that they were on the signature cards. After the defendant got a discharge in August of 1996, for the first time, I believe in October or November of, I'm sorry, August 1995, in October or November of 1995, John Bucell then appears and announces that he is the president of BBL. When in fact, prior to that time, during the entire course of the conspiracy starting in 1993, Esegasemi was the president and sole owner of BBL. John Bucell appears as the owner of BBL and an account is set up at Payne Webber in, I believe, January of 1996, still within the ambit of the charge conspiracy. That money is moved into the Payne Webber account in January of 1996. In February, I believe it's moved to an entity called Global Capital Enterprises and thereafter it makes its way across, it goes to the Cayman Islands and then it ends up in Switzerland in a bank account called Syntex Financial Corporation. There was evidence at trial that defendant was involved in the setting up of Syntex Financial Corporation in the Swiss bank account in 1993. There was testimony from Mr. Gerd Kusch that she met with the defendant in 1993 to set up the Syntex Financial Account. So the district court certainly had ample evidence to connect this defendant with the million dollars that was hidden from the bankruptcy court and the trustee. And the notion that, I'd also like to, the whole so-called valuation that was presented by the defendant was based on the false premise that somehow you get to subtract costs that are incurred that would have occurred in the event the defendant acted lawfully that the bankruptcy trustee might have incurred by having to pay taxes. Well, the fact of the matter is it's charged in the indictment that the bankruptcy trustee was one of the victims of the crime. And so the bankrupt, if we're just, if we're doing this sort of alternative scenario pursuant to which what would have happened had the defendant acted lawfully. We would submit had the defendant acted lawfully, she wouldn't have been eligible for a discharge. Well, take me through the numbers on that. You heard my colloquy with Mr. Marmoleff. Well, the numbers that were before the district court and are in the PSR. Now, this part goes to the amount of restitution, right? Yes, it does. Although I would submit that under Feldman, what the district court was doing with regard to intended loss was it was considering the gross value of assets concealed, of which there was ample evidence. There was the million dollars in the bank account. There was $500,000 of equity in the ski condominium in Park City, Utah. There was evidence submitted by, and an appraiser testified at trial that he did an appraisal in July of 1995, compared three properties. The value of that property was $800,000. The only real loan on that property was $312,000. So there was $500,000 in the ski condo, so you're up to $1.5 million. There was a San Diego farm, a 50-acre parcel. There was evidence submitted at trial that the value of that was between a million and a million and a half. There was $1.3 million in disability income that was not disclosed in the Statement of Financial Affairs. Now, that's an exempt asset, but under Feldman, the court, in determining intended loss, is to consider the value of all assets, including an exempt asset, and can infer intent from the fact that the defendant concealed a large amount of money. Counsel, what about Mr. Momosky's point that the indictment as to Count 1 specifically referred only to three assets? Well, first of all... Beyond those three in your analysis. I mean, first of all, as we argued in our brief, the question before the court with regard to sentencing is relevant conduct in any event. So I don't believe, if the court finds that those assets were concealed within the scope of the conspiracy, within the scope of the course of conduct, whether charged or not, because even if you're not charged with a conspiracy, it's part of a common course of conduct that can be considered by the court. We also argue that there was... At this trial, the co-defendant was charged, I believe, in Count 7 with having made a false statement on July 11, 1995, in that he... I'm sorry, it was Count 9. He stated that he knew he had... He said there were no additional substantial assets other than those referenced on the petition. And the defendant made a request for the bill of particulars, I think in January of 2001, and we enumerated in two different letters to the defense that are part of our accepted record. I can refer the court to them. We enumerated all these other assets, including CIBM, which was the San Diego property, Syntex, which was the Swiss bank account, international trading partners, which is where the defendant and her husband hid the disability income. And that, Count 9, is also that act, is referenced as overt act. You can't get to that larger amount unless you aggregate the counts, in effect, is what you're arguing? Which larger amount? We can get to the million plus... The assets that were charged... I'm trying to decide between two positions with respect to the amount involved. You heard the appellant say that you only look to the three specified assets in Count 1, which would net something like $85,000. Right. Now, you're getting into the multi-millions here. Yes. Without reference to that argument, and I'm trying to find out... What I'm talking about... I appreciate that, Your Honor. I'm talking about, first of all, the gross value of the assets, which I think would be appropriate to consider in evaluating intended loss. The gross value of the charged assets are as follows. First, the million dollars in the BBL bank account. Second, the $500,000 in equity in the ski condominium. Third, $1.3 million in disability insurance proceeds that were received in the 26 months prior to bankruptcy and were concealed, because in the Statement of Financial Affairs, the defendant and her husband disclosed that they had received $300,000 in disability insurance proceeds. In fact, they had received $1.6 million. Now, arguably, that's an exempt asset, but we would submit the court can consider the concealment of the receipt of that large amount of cash income in conjunction with the concealment of a hidden bank account with a million dollars in it in conjunction with the concealment of $500,000 in equity in a ski condominium, and also consider that the defendant had spent three years setting this whole thing up with her lawyers to determine that the defendant intended to defraud her creditors of all and wipe out all her debts while holding on to her assets. If you get the other assets that are encompassed in the Bill of Particulars, include the San Diego farm, the Syntex bank account, international trading partners, which was set up to conceal the disability income, and the Palm Springs condominium, and Magnum Industries, which was also a laundry business that was set up and supposedly owned under the T. Victor Irrevocable Trust. If you consider all those assets were actually listed on a chart, which was Government Exhibit 906, and if you look at the date of the formation of most of the corporations on that chart, it coincides with the time in the conspiracy where they started concealing assets in anticipation of bankruptcy. That was May or June of 1992. All those corporations were concealed, and that is evidence of the defendant's intent. Okay. That's on intent. Now, relate that to the restitution issue, the computation of the amount of restitution. Well, I think under Feldman, and this Court instructed the Court to follow Feldman in calculating the restitution, the Court's supposed to figure out what would have happened to the victims had the defendant acted lawfully. And we would submit under two different scenarios had the defendant acted lawfully, she would not... The District Court decided on this basis, and that's the basis on which we're defending the actual loss, is the amount of debt actually discharged, which I believe was in the neighborhood of $2.29 million. The analysis is as follows, under two different scenarios. Had the defendant... We believe the evidence of trial is sufficient to conclude that had the defendant acted lawfully means she would not have set up all these corporations in 1992, because the purpose of these corporations, including BBL, was to conceal her assets from her creditors, avoid liens and attachments in the pre-bankruptcy period, and then discharge all her debts. So had the defendant not used this maze of corporations when she came to file for bankruptcy in March of 1995, she would have had to disclose. She had a million dollars, but she had all these assets. The appellant says that there was no finding of fact made by the trial judge in this case. What's your response to that? No finding of fact with regard to the restitution issue? Yeah. I think the court found that had the defendant truthfully and lawfully disclosed her assets, even setting aside on the alternate scenario, you'd have to look at what would have happened at the time she filed for bankruptcy. She would have had to disclose that she owned an interest in a medical management company with a million dollars in the bank, and the nominal owner was her bookkeeper, who also testified she didn't... I don't think... But you can't point us to a specific place in the record where these findings are made, right? I mean, where can you point me in the record to where there were specific factual findings about the value of appellant's assets and debts? I think the finding that the court made... Wander Feldman, the court is... There are sort of two alternative scenarios. One is you can look at the assets and determine whether the assets were equal to the debts or less than the debts and order restitution on that basis. Or you can find that had lawful and lawful disclosure been made, the defendant would not have been eligible for a discharge. Okay. How do we know what numbers the court was using? Was the court using the PSR? Or what was that... What numbers was the court using? How do they get to the 2.3? The 2.3 is the amount of actually discharged debt. What the court is finding is the court's determination that that's the appropriate amount of restitution is based on the premise that the defendant was not eligible for bankruptcy. A reasonable trustee would not have... Okay. And to find that, to come to that conclusion, how do I know what numbers the court used? I think the court took into account all the facts that were presented to it, namely that had a truthful disclosure been made at the time of bankruptcy, the defendant would have had to disclose BBL. And there's no issue... I mean, it's undisputed, there's $949,000 in the bank account in BBL. Well, did the court adopt the PSR? Yes, the court adopted the PSR in its initial... and that's in the tentative ruling in the first order, except for some modifications as to paragraphs 40 and 48. And that certainly forms a predicate for the court's determination that had a full and truthful disclosure been made at the time of the bankruptcy, the defendant would not have been eligible for bankruptcy. So is that an implied finding or an express finding with respect to the 2.3? The 2.3 is... there's no... it's also undisputed. The amount of actually discharged debt is $2.3 million. Okay, but to get there, the court would have had to say that the value of the concealed assets was $2.849, or whatever that was in the PSR, and then come up with... if you add that to what they did disclose, that that was... so they actually had enough money to pay their debts, they wouldn't have been eligible for bankruptcy, and so the amount of restitution is what they discharged because that was the actual loss, because they wrongfully discharged them, right? That's correct. But the court never said it that way. Well, the court also could have come to that conclusion based on the notion that had... I mean, it's apparent, based on what the defendant was convicted of, that a full and honest disclosure would have disclosed $949,000 in a bank account held in somebody else's name, and the defendant would have had to explain that. The defendant would have had to explain that there was another company, International Trading Partners, in which all this disability income had been set, and the presumption is, and we argued as an alternative ground, that the bankruptcy trustee also could have referred the matter to the bankruptcy court, and a reasonable judge would have dismissed this case for substantial abuse. I'm assuming that the 2.3 is accurate. Shouldn't that be offset by the amount of the IRS proceeds? Well, the IRS has seized some funds, but the defendant is still litigating. The IRS is a victim. Yes. They recovered. So why restitution to someone who has already recovered? Well, they have not recovered. They have seized some assets of the defendant. They put a lien on assets. The defendant went to tax court. And none of that was converted? No. When that's done, should that be credited against the 2.3? Yes. I mean, if the tax court judge rules that the IRS prevails in that proceeding, then I think there's about $1,057,000, if I'm not correct, that was discharged from the IRS's debts, and that would be credited. And the normal way that that would occur. That would reduce the 2.3, in your view. Yes. And defendants are, generally speaking, in cases like this, defendants come back to district court and they say, we should get credit for that, it's now been paid. Well, that's the express terms of the restitution order, is it? Correct. Now, I want to get – well, first of all, I don't hear you very responsive to the precise questions that have been asked. And I'm going to – I apologize. I'm trying to be responsive. I take it that the pre-sentence report has all these numbers in it. Yes. The district court adopted the pre-sentence report and overruled the objections to it. With the exception of some issues as to paragraphs 40 and 48, yes. And it did that before the first appeal. Correct. Has that adoption of that pre-sentence report, or whatever the court did, before the prior appeal ever been unraveled, or is that order adopting the pre-sentence report still operating? Yes, that's still operative, Your Honor, because – All right. On the second set of proceedings, the defendant didn't even revisit the guideline calculation. So the court found true whatever was contained in that pre-sentence report except to the extent that it sustained the objections to it. That is correct, Your Honor. And that's still enforced? Yes. All right. Now – and to that extent, at least, the court then did or didn't adopt certain numbers, right? That is correct, Your Honor. Now, I want to go to another subject matter, and that is the refusal of the court to set aside these – what were they? Forfeitures. Deeds of – deeds that were to secure the appeal. I see. Your Honor, did I have my co-counsel address that issue? Well, maybe if the rest of the court is finished with these questions, I just want to hit on that for a bit. I'm happy to. Okay. That's fine. Thank you, Your Honor. I apologize for not being precise. All right. Good morning, Your Honors. Rhonda Kassenstein for the United States. Judge Levy has a question. Now, these deeds, or whatever they were – I guess they were deeds, trusts, or something that were deposited with the clerk. That's correct. To somehow stay the execution of restitution during the pendency of the other appeal. That's correct. That was the term of that. Yes. Then when that appeal was over and the mandate came down, there was no order of restitution for that interim period, right? That's correct. And the court was asked during that time, discharge this or return this. And the court said, no, I'm not going to do that because I'm going to order restitution and you might appeal to the defendant, so I'm going to hold on to this. Now, how does the court get to do that? Your Honor, what happened was the defendant brought a motion – brought a motion for reconveyance of the trust deeds. There was a hearing on November 21st, 2005, to discuss – And the court said no. Actually, the court said, I'm going to defer ruling on that. I'm going to take that under submission. I'm going to defer ruling on that until we have the hearing on the proceedings on remand, the full hearing which was scheduled for January 30th. So the court said no then and I'll – I mean, the court didn't reconvey them then, so that's a no and I'll rule finally later. The court took them under submission. And what the court said at that hearing was this court, the panel of this court in its original ruling, did not say that there should be zero restitution. It vacated the order. Yes, but this is a security arrangement. It's like a supersedious bond. Your Honor, that's true. And the court asked the defendant, when the defendant suggested what harm there was, because the court was concerned, the court assumed that at the follow-up hearing on January 30th, there would be potentially a new order of restitution. And so as a matter of efficiency, that the court maintained the bond. But the question is, if that was an incorrect decision by the court, whether there was any prejudice or any harm to the defendant by that. And at the November hearing, the judge asked about that and the defendant stated that the harm was that that property was subject to an above-market mortgage. And the court said, if that's the case, we will reconvey it for the purpose of refinancing. I would look favorably on a motion to do that. And no motion was brought to do that. The trouble I'm having, the trouble I'm having, is that those deeds had a purpose. And I don't know whether there were third parties involved. The property that was posted belonged to another trust. And not a party to this case. That's true. And gave that responsibly as, I'm going to say, supersedious. Right? Yes. And when the appeal's over and there's no pending thing, the court says, I'm not going to reconvey it to whoever that third person is who conveyed that for this purpose of supersedious. Your Honor. It's okay. Well, Your Honor, we acknowledge that as a technical matter, it may have. Well, that's what we deal with. That is certainly true, Your Honor. But then the next question has to be, if there was error, was it harmless? And I would propose to the court that it was harmless in the sense that the defendant was offered expressly the opportunity to have the deed reconveyed to address the harm the defendant identified. The defendant didn't do that. The court also noted that this defendant's crimes of convictions had been with respect to hiding assets from creditors. Yes. The court was concerned that a judge, when a restitution order was issued, there might be a difficulty with that. That goes to a separate issue. If the court had power to prevent somebody from fraudulently stripping themselves of assets, it could have ordered. But the issue in this case is whether or not it was error to deny that motion. Is it not? It is, Your Honor. And I would — That involves a third person. I would — again, I would just suggest, Your Honor, that the court was within its — All right. I hear you. If there are no other questions with respect to that, thank you. Thank you, Counselor. Your time has more than expired. Mr. Marmolewski, you have about a minute and 18 seconds, but we took the government two and a half minutes over, and I'll give you the same. All right. Thank you. Let me begin with restitution. Restitution is based on actual loss, and it's actual loss of the crime of which the defendant has been convicted. Under Kane and Polikemi, I think you need to read Count 1 together with Count 4. Count 4 was the acquittal of concealing equity in the Utah condominium. So I think the universe of what we're talking about here are the net value of the funds and the two bank accounts after they would have been applied to creditors. The court made absolutely no finding as to any value on remand. The court disregarded, I'm sure unintentionally, but did not follow the mandate of this court. Feldman is very clear that you have to go and find out what would have happened if the defendant had acted lawfully from day one. In effect, what you have to do here is prepare a new bankruptcy schedule and say what shows up on the asset side, what shows up on the liability side, and where are we? And the argument that the government made just now and made below was, well, this defendant was concealing stuff. But that's not what Feldman tells us. It's not what the Ninth Circuit said last time around. It's assumed that she acted lawfully. And the same argument that the government just made here and that they made below was made by Feldman. If the court reviews, once again, the Feldman opinion, the government in Feldman said you should operate under the assumption that the bankruptcy court would have denied the exemption because the assets that were exempt were not listed on the bankruptcy petition. And what the court said in Feldman is that's what happens in the bankruptcy court in the first instance because of the principle of deterrence. But we're not talking about deterrence. We're not talking about bankruptcy court proceedings. We're talking about restitution to victims of crime. And when we're talking about restitution, you look at it from the analysis of how much is the victim, then the victim would have been if the defendant had acted lawfully at all times. And you cannot make that determination unless you go and you value all of the assets that were not disclosed on the bankruptcy petition. And those are assets that are subject to exemptions in the case of the disability benefits. Those are assets that are subject to capital gains taxes with respect to the Utah condominium. It's not just a $300,000 mortgage, but there's also capital gains taxes that would have been applied before a creditor would have received any money. So we can't look at that income stream for purposes of restitution, but you heard the government argue that you could in terms of the global aspect of the sentencing. Right. I heard the government argue that. The government is incorrect. Again, first of all, you have to look at actual loss. And the only way you get to actual loss is to see how much worse off the creditors are than they would have been if everything had been properly disclosed. If you apply intended loss, and I, with my coffee can analogy, showed you why we're not talking about intended loss, but to use intended loss, you have to look at what the defendant understood that these assets were worth. Mr. Stern referred to the San Diego properties and what was presented at trial. Nothing was presented concerning any value of the San Diego properties at trial. My client wasn't asked a single question in several days of testimony about the San Diego properties. And, of course, the San Diego properties are nowhere in the indictment. You know, this testimony about Swiss bank accounts and opened by my client, well, number one, not only was she acquitted of that, but the testimony was, I don't know whether or not Mrs. Bussell knew about the bank account. I know her husband knew about it. That's the testimony. On the trustee question, Your Honor is absolutely correct. It is automatic under the California statutory scheme. When the security, when the debt that the security has been recorded as security for has been extinguished, the deed has to be reconveyed automatically. It was never reconveyed. Thank you, counsel. Your time has expired. The case just argued will be submitted for decision.
judges: O'scannlain, Leavy, Callahan